

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00057-CR

———————————————

BYRON TROY WELLS, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 2
Tarrant County, Texas
Trial Court No. 1487274D

Before Gabriel, Kerr, and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

In a single issue challenging the jury charge's failure to define "aggravated assault" and "bodily injury," Appellant Byron Troy Wells appeals his aggravated-assault conviction. Because the absence of those definitions did not cause him egregious harm, we affirm.

## Background

Emily[1] and Wells had been longtime friends when, in the early morning hours of February 12, 2017, Wells texted Emily asking if she wanted to hang out and drink some whiskey. Emily said yes, and Wells came over with whiskey and beer. This is where Emily's and Wells's accounts of the night diverge.

### I. Emily's version of events and the State's case

According to Emily, the pair hung out for about thirty or forty-five minutes before Wells became upset when she refused his sexual advances and asked him to leave.[2] Wells left by 3:00 a.m. but then started texting her again around 7:00 a.m. to tell her that he had left his boots in her apartment and would kick down her door if she did not open it. Emily denied having his boots, but she answered the door out of fear

---

[1]We use an alias to protect the complainant's identity. *See* 2nd Tex. App. (Fort Worth) Loc. R. 7.

[2]Both Emily and Wells testified that their relationship involved trading sexual innuendos but denied having had a sexual relationship in the past. For example, Emily was not surprised when Wells proposed "whiskey for sex," and she brushed it off "because he has that kind of personality, just . . . joking about sex all the time."

that her neighbors would call the police and the apartment management would find out that she was subletting the apartment without its approval. She also hoped that if she "just let him come in," he would leave when he realized she did not have his boots.

By her own account, Emily was mistaken. She recalled at trial that Wells immediately punched a hole through a TV; broke her phone by throwing it against the wall and stomping on it; and picked up another TV, hit her over the head with it, and forced her to the ground. She described feeling "stars" when he hit her in the head with the TV, but she testified that what she "felt most" was his grip around her throat, choking her. He held a pocketknife to her throat; hit her several times in the face and body; choked her "several times"; and then traded the knife for a gun, which he held to her head while telling her to "shut up" when she tried to scream for help. According to Emily, Wells then ripped her clothing off; tried to force her to give him oral sex by placing his penis in her mouth; and tried to penetrate her vaginally, but he was impotent. Angered by his inability to get an erection, he continued choking Emily until she urinated "everywhere" and "passed out." Emily thought she was "going to die."

When Emily came to, she tried to escape by running for the door, but Wells grabbed her, threw her back down, and got back on top of her. He continued beating her, choking her, and holding the gun to her head for what felt to Emily "like eternity." He tried to anally penetrate her with a wooden paper-towel holder, and he put his gun between her legs, though she was not sure at trial if he touched her vagina with it.

Suddenly, Wells "just kind of snapped out of it and got up and [acted] like everything was fine," and he left.

Emily immediately drove to her sister's house nearby and told her what had happened. They reported the assault, and Emily recounted the events to the police and to a Sexual Assault Nurse Examiner (SANE) at the hospital. Testimony by Emily's sister, the investigating police officers, and the SANE shared a number of common threads, including

- their observations of extensive bruising on Emily's face, neck, shoulders, arms, hands, wrist, and torso;[3]

- Emily's accounts of Wells's attempts to try to rape her with his penis, the gun, and the paper-towel holder;

- Emily's report that Wells was impotent during the assault; and

- Emily's reports of losing consciousness due to Wells's strangulation of her.

The SANE also noted burst blood vessels in Emily's eyes, consistent with strangulation, and injuries to Emily's vagina and hymen that were consistent with the sexual-assault allegations. Additionally, the police crime lab matched Wells's DNA to DNA found on swabs of Emily's vagina and neck and could not exclude Emily as a contributor to DNA evidence found in swabs of Wells's penis and the barrel of his handgun. The trial court also admitted into evidence an envelope found at Emily's

---

[3]Photographs of the bruises were admitted into evidence and shown to the jury.

4

apartment bearing the handwritten message, "I broke f[***]ing everything, Byron Wells, 2/17/17."

Part of Wells's defense was to highlight inconsistencies between Emily's account at trial and what she had told her sister, the police, and the SANE, including conflicting testimony and accounts of whether Wells had penetrated her vagina with his gun and Emily's failure to report to some officers that Wells had tried to anally penetrate her with a paper-towel holder. The defense also emphasized that Emily did not testify to any threat by Wells to kill her and himself, though she had told the lead detective and the SANE that Wells had said "that he was going to take the gun, put his head beside hers, and using one bullet end both their lives." In response, the State countered with testimony that all trauma victims do not respond the same, do not remember every detail the first time they give a statement, and may provide additional details in later accounts.

## II. Wells's version of events

Testifying in his own defense, Wells denied all of Emily's allegations of assault, instead describing the night as a funny-but-awkward attempt at sex. He said that they were in good moods, kidding around, and making funny comments back and forth, "some sexual innuendos." He averred that Emily drank "[q]uite a bit" of alcohol, to the point of seeming intoxicated, and that they started kissing and sexually touching each other. He described them laughing and rolling around and his unsuccessful

5

efforts to perform. Eventually they just wound down, put their clothes back on, and he left about three hours after he had arrived.

He then realized that he had left his boots and medication at her apartment, so he went back for them and became frustrated when Emily did not answer the door. He admitted that he broke the TV but portrayed it as an accident and claimed the second TV was already broken. He denied being in any kind of rage and claimed that he wrote the angry note on the envelope as an attempt to divert any blame from Emily for the broken TV.

At trial, Wells portrayed their dispute as one over money, saying that Emily became frustrated and "maybe a little angry" when he refused to lend her money. He denied hurting Emily, attributing her bruises to possible fights with her on-and-off boyfriend. He explained that he always carried a gun and a pocketknife for protection, and he associated Emily's DNA on the gun with her having handled it in the past. He dismissed photographs taken the day after the incident that showed scratches and cuts on his own body as having happened a couple days earlier while working on a car.

## III. The trial and conviction

Wells was tried on five counts: (1) aggravated sexual assault by inserting a gun into Emily's sexual organ, enhanced by a deadly-weapon allegation; (2) aggravated sexual assault by contacting his sexual organ with hers, enhanced by a deadly-weapon allegation; (3) aggravated sexual assault by forcibly performing oral sex on Emily, enhanced by a deadly-weapon allegation; (4) aggravated assault by threatening bodily

6

injury with a deadly weapon; and (5) attempted aggravated sexual assault by attempting to insert a paper-towel holder into her anus. The jury acquitted Wells of counts three and five but convicted him of counts one, two, and four. This appeal followed.

**Discussion**

In his only issue, Wells asserts that he was egregiously harmed by the charge's failure to define the terms "aggravated assault" and "bodily injury." Although the State disagrees with Wells's assertion of egregious harm, it concedes that the definitions' absences were errors. *See Plata v. State*, 926 S.W.2d 300, 302 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234, 235 (Tex. Crim. App. 1997).

Egregious harm is the proper standard of review because Wells failed to object at trial to the definitions' absence. *See Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19. In making an egregious-harm determination, the reviewing court must consider "the actual degree of harm . . . in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. *See generally Gelinas v. State*, 398 S.W.3d 703, 708–10 (Tex. Crim. App. 2013) (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*

*v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011) (citing *Almanza*, 686 S.W.2d at 172). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.

Considering the jury charge as a whole, the Court of Criminal Appeals has recognized the application paragraph's importance as the charge's "heart and soul" because it specifies the factual circumstances under which the jury should convict or acquit. *Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012). Because of this, "[w]here the application paragraph correctly instructs the jury, an error in the abstract instruction is [generally] not egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999).

*Medina*—a capital-murder case—involved the failure to correctly define "knowingly" in the jury charge. *Id.* at 639. The Court of Criminal Appeals held that the error did not result in egregious harm after considering the charge in its entirety, the record as a whole, and the nature of the charged offense. *See id.* at 639–40. It emphasized that the application paragraph correctly instructed the jury that it must believe beyond a reasonable doubt that the defendant had "intentionally or knowingly caused the death." *Id.* at 640.

More recently, the Court of Criminal Appeals considered the nature of aggravated assault in examining the harm of a charge that failed to define "bodily injury." *See Marshall v. State*, 479 S.W.3d 840, 842–43 (Tex. Crim. App. 2016). In finding no egregious harm, the court reviewed the statutory definition of aggravated

8

assault as an enhancement of simple assault and the definition of "bodily injury" as "physical pain, illness, or any impairment of physical condition." *Id.* at 844; *see also* Tex. Penal Code Ann. § 1.07(a)(8). Because the application paragraph properly required the jury to find the defendant guilty of aggravated assault if he impeded the victim's normal breathing by covering her face with a pillow, the jury charge did not allow the jury to find him guilty without finding the essential element of bodily injury. *Marshall*, 479 S.W.3d at 844 ("By finding that [the defendant] impeded [the victim]'s breathing, the jury found bodily injury per se.").

As charged here, aggravated assault is simple assault—the intentional, knowing, or reckless threatening of bodily injury to another—committed with the use or exhibition of a deadly weapon. Tex. Penal Code Ann. §§ 22.01, 22.02. The application paragraph properly instructed the jury to convict Wells of aggravated assault if it found that he threatened imminent bodily injury using or exhibiting a gun or a knife:

> Now, if you find from the evidence beyond a reasonable doubt that the Defendant, Byron Troy Wells, in the County of Tarrant and State of Texas, on or about the 12th day of February, 2017, did intentionally or knowingly threaten imminent bodily injury to [Emily] and the Defendant did use or exhibit a deadly weapon during the commission of the assault, namely a firearm; or did intentionally or knowingly threaten imminent bodily injury to [Emily] and the Defendant did use or exhibit a deadly weapon during the commission of the assault, namely a knife, then you will find the Defendant guilty of the offense of aggravated assault as charged in Count Four of the Indictment.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the Defendant of Count Four and say by your verdict "not guilty."[4]

Like the charge in *Marshall*, this charge required the jury to find each element of the offense of "aggravated assault," undermining Wells's argument of egregious harm. *See Marshall*, 479 S.W.3d at 842–43; *see also Medina*, 7 S.W.3d at 640.

Nor did the absence of the "bodily injury" definition cause egregious harm. "Bodily injury" is not a "complex or unusual term, and the legal definition is much like the common meaning of the word." *Mosley v. State*, 686 S.W.2d 180, 182 n.2 (Tex. Crim. App. 1985). In this case, there was no obvious confusion about the meaning of bodily injury or the threat of it and no evidence that the jury was in any way misled by the omission of a "bodily injury" definition. *See id.*

The State accurately explained in its opening argument the elements of aggravated assault and provided examples of the threats of bodily injury testified to by Emily:

> Count Four involves simply aggravated assault. Did he intentionally or knowingly threaten imminent bodily injury to her. You heard her testify how he held her down repeatedly, choked her until the point where she was blacking out and urinated on herself. Held a knife to her throat, put a gun to her head, and said, I'm going to blow out my head and yours and we're just going to have this whole thing over now.

---

[4]Additionally, the charge's abstract portion defined "threats" as being "communicated by acts or words, or both," and "deadly weapon" as including a "firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."

Emily testified at length to Wells's threatening behavior—throwing televisions, hitting and punching her, choking her, sexually violating her, and—key to the aggravated-assault charge—holding a gun to her head and a knife to her neck. Multiple witnesses testified to their observations, and the jury saw photographs of extensive bruising on Emily's face, neck, arms, and hands. And Emily told a detective and a SANE that Wells had threatened to kill himself and her with his gun, which he also admitted bringing into the apartment. The jury was entitled to believe Emily, her sister, the investigating officers, and the SANE; disbelieve Wells; and conclude that he had threatened her with imminent bodily injury. *See, e.g., id.*

Considering the record as a whole, we are not persuaded that the trial court's errors affected the very basis of the case, deprived Wells of a valuable right, vitally affected a defensive theory, or made a case for conviction clearly and significantly more persuasive. *Taylor*, 332 S.W.3d at 490. In such absence of egregious harm, we must overrule Wells's sole issue.

## Conclusion

Having overruled Wells's only issue, we affirm the trial court's judgment.

11

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  September 10, 2020